F I L E D
United States Court of Appeals
Tenth Circuit

July 6, 2005

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

TYRESE SHAROD SMITH, also
known as Seagram,

Defendant - Appellant.

No. 03-4240

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D. Ct. No. 2:02-CR-289-01-TC)

Tyrese Sharod Smith, Florence, Colorado, filed a pro se brief.

Catherine Conklin (Deirdre A. Gorman, with her on the briefs), Ogden, Utah,
appearing for Appellant.

Diana Hagen, Assistant United States Attorney (Paul M. Warner, United States
Attorney, and Robert A. Lund, Assistant United States Attorney, with her on the
briefs), Office of the United States Attorney for the District of Utah, Salt Lake
City, Utah, appearing for Appellee.

Before **TACHA**, Chief Circuit Judge, **McKAY**, and **EBEL**, Circuit Judges.

**TACHA**, Chief Circuit Judge.

A jury found Defendant-Appellant Tyrese S. Smith guilty of conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d), murder in aid of racketeering activity in violation of 18 U.S.C. § 1959(a), and using a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(c). All three convictions stem from Mr. Smith's leadership of a Salt Lake City street gang known as the King Mafia Disciples ("KMD"). On appeal, Mr. Smith, through his trial attorneys, contests the first two convictions based on the sufficiency of the evidence and the propriety of the jury instructions. Mr. Smith also raises four additional issues in a pro se supplemental brief. We take jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

The facts involved in this case are complicated and lengthy. Given that Mr. Smith contests the sufficiency of the evidence against him, we provide much of the relevant details in the course of our legal analysis. To begin with, however, we provide a brief overview of this case.

Mr. Smith, along with five others, formed KMD while in juvenile detention at the Decker Lake Youth Detention Center in the early 1990s. The gang was modeled on the Chicago "Gangster Disciples," although the two gangs were never affiliated. Mr. Smith was the undisputed leader of KMD and often went by

the self-appointed title "King Seagram" to evidence his leadership role. KMD had a formal process for initiating new members into the gang, which included sponsorship by a current member, a probationary period, completion of a "mission," and a physical initiation. KMD also had a formal hierarchy of members who were assigned ranks—Reverend, Minister, Priest, Knight, Bishop, and Rook—to identify their standing in the gang. KMD was governed by rules established by Mr. Smith, known as the KMD "bible," including the requirement to attend meetings, to maintain a code of silence, and to provide financially for other KMD members. Members who violated the rules were subject to different levels of penalties depending on the gravity of the offense. The record also indicates that KMD held regular meetings at which gang business was discussed and directives were issued by Mr. Smith, or, during times when he was in prison, the highest ranking member who was present.

The overall goal of KMD was to be the most powerful gang in Salt Lake City and to protect its members. These goals were often accomplished through violent retaliatory attacks on rival gangs, which tended to increase the reputation and notoriety of KMD, and, in turn, decreased the likelihood that KMD members would be similarly attacked. Indeed, KMD's philosophy concerning retaliation was that KMD members should respond with twice the violence to rival gang members' attacks against them.

Another purpose of KMD was to provide financial assistance to its members and their families. To do this, KMD distributed marijuana on the streets and also controlled the marijuana trade in the Utah State Prison. Home invasion robberies were another way KMD members made money. The gang generally targeted drug dealers' homes because a drug dealer is unlikely to call the police and because they could steal drugs as well as cash. The homes of drug dealers also frequently contained guns, which KMD would also steal and use to commit other crimes. Through drug trafficking and robberies, KMD members would contribute money to those members needing help—including the wives and children of incarcerated KMD members.

Members of KMD were constantly moving in and out of the Utah penological system. Mr. Smith, in fact, was incarcerated in 1994 for his participation in a drive-by shooting. He was paroled in October 1995, but he violated his parole two months later and was returned to state prison. He was then sentenced for the murder of Joey Miera, which was committed by KMD members upon an order that he issued while incarcerated on the drive-by shooting charge. Despite these periods of incarceration, Mr. Smith retained control of KMD, issuing rules and orders—often on a daily basis—from his prison cell.

In 2002, while Mr. Smith was serving time for the murder of Mr. Miera, a federal grand jury returned a three-count indictment charging Mr. Smith with

conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d) ("RICO conspiracy"), murder in aid of racketeering activity in violation of 18 U.S.C. § 1959(a), and using a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(c). Numerous other KMD members were named as coconspirators in the § 1962(d) charge, but, because the others pleaded guilty or testified against him, Mr. Smith was tried individually. The Government introduced evidence of numerous so-called "predicate acts" to support this RICO conspiracy, including: three separate instances of conspiracies to commit murders and attempted murders of rival gang members, conspiracy to commit arson and attempted arson of a rival gang member's home, conspiracy to commit murder and the murder of a rival gang member, conspiracy to commit robbery, and conspiracy to commit aggravated robbery.

Prior to trial, Mr. Smith twice asked the District Court to discharge his court-appointed attorneys and allow him to represent himself. The District Court both times denied Mr. Smith's request to proceed pro se but allowed Mr. Smith to submit his own oral and written motions directly to the court. The case then went to trial, and the jury convicted Mr. Smith on all three counts. The District Court sentenced him to two life terms plus ten years' imprisonment.

After the jury found Mr. Smith guilty on all three counts, he, through

counsel, timely appealed his convictions under 18 U.S.C. § 1962(d) and 18 U.S.C. § 1959(a). With respect to the first conviction, he argues both that the evidence was insufficient to convict him and that the jury was improperly instructed on the elements of the crime. As to the second conviction, he argues that the Government's evidence was insufficient to support a conviction. After Mr. Smith's attorneys filed his opening appellate brief, Mr. Smith moved this Court to discharge them and replace them with new counsel. We denied this motion but allowed Mr. Smith to file a pro se supplemental brief raising any additional issue he desired. In that brief, Mr. Smith raises four arguments that we address in the last section of this opinion.

## II. SUFFICIENCY OF THE EVIDENCE CHALLENGE TO THE CONSPIRACY TO VIOLATE RICO CONVICTION

Mr. Smith first argues that the Government's evidence at trial was insufficient to support a conviction under 18 U.S.C. § 1962(d). In evaluating the sufficiency of the evidence, we review the record de novo. *United States v. Nelson*, 383 F.3d 1227, 1229 (10th Cir. 2004). There is sufficient evidence to uphold a conviction if a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.* In making this determination, we review the direct and circumstantial evidence, along with all reasonable inferences therefrom, in the light most favorable to the Government. *Id.*

Mr. Smith was convicted of violating 18 U.S.C. § 1962(d), which makes it

"unlawful for any person to conspire to violate" 18 U.S.C. § 1962(c). Because this conspiracy provision lacks an overt act requirement, a defendant can be convicted under § 1962(d) upon proof that the defendant knew about or agreed to facilitate the commission of acts sufficient to establish a § 1962(c) violation. *See Salinas v. United States*, 522 U.S. 52, 63–66 (1997).

In *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985), the Supreme Court held that "[a] violation of § 1962(c) . . . requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id*. at 496 (internal note omitted).[1] To clarify what conduct is necessary to prove a violation of § 1962(c), some courts have expanded this test to incorporate additional elements of the statute. *See, e.g., Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). We adopt this approach to establishing a violation of § 1962(c), and because a defendant violates § 1962(d) by conspiring to violate § 1962(c), we hold that in order to convict a defendant for violating § 1962(d), the Government must prove beyond a reasonable doubt that the defendant: (1) by knowing about and agreeing to facilitate the commission of two or more acts (2) constituting a pattern (3) of racketeering activity (4) participates in (5) an enterprise (6) the activities of

---

[1]These requirements are taken directly from the text of the statute, which makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

-7-

which affect interstate or foreign commerce.

With this in mind, we turn to Mr. Smith's arguments on appeal. He contends that the Government failed to present sufficient evidence: (1) of the existence of a RICO enterprise; (2) of a pattern to the racketeering activity; (3) of a nexus between the enterprise and the racketeering activity; (4) that he agreed to facilitate the commission of the racketeering activity; and (5) that the enterprise, if any, was engaged in, or its activities affected, interstate commerce.[2]

*A.     Enterprise*

The jury concluded that Mr. Smith participated in the affairs of KMD, which it further found to be an "enterprise" under RICO. On appeal, Mr. Smith does not deny his involvement with the gang but simply argues that the Government failed to prove that KMD was an enterprise.

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In *United States v. Turkette*, 452 U.S. 576, 583 (1981), the Supreme Court held that a RICO enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." The

---

[2]Because Mr. Smith's interstate-commerce argument with respect to the sufficiency of the evidence is interwoven with his interstate-commerce argument with respect to the jury instructions, we address it in Part III.A. below.

Court also emphasized that the concepts of an enterprise and a pattern of racketeering activity are distinct, stating that "[w]hile the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other." *Id.*

Many of our sister circuits have had occasion to flesh out the *Turkette* definition of "enterprise." *See, e.g.*, *United States v. Darden*, 70 F.3d 1507, 1520 (8th Cir. 1995). While this Court has never specifically adopted a scheme for analyzing the enterprise element of a RICO claim, in *United States v. Sanders*, 928 F.2d 940, 943 (10th Cir. 1991), we took direction from the Third Circuit's decision in *United States v. Riccobene*, 709 F.2d 214, 222 (3d Cir. 1983), *abrogation on other grounds recognized by United States v. Vastola*, 989 F.2d 1318, 1330 (3rd Cir. 1993).

Guided by *Sanders*, we now adopt the *Riccobene* framework and hold that the Government establishes an enterprise when it proves three elements. First, the Government must prove the existence of "an ongoing organization with a decision-making framework or mechanism for controlling the group." *Sanders*, 928 F.2d at 943. *See United States v. Walters*, 269 F.3d 1207, 1211 (10th Cir. 2001). Second, the Government must prove "that various associates function as a continuing unit." *Sanders*, 928 F.2d at 944. Finally, the Government must prove that the enterprise exists "separate and apart from the pattern of racketeering

activity." *Id.*

Mr. Smith does not challenge the first element on appeal; thus we do not consider it. We turn now to the second and third elements.

1.      Continuing Unit

The second element that the Government must prove to establish that KMD was an enterprise under RICO is that its "various associates function[ed] as a continuing unit." *Turkette*, 452 U.S. at 583. This element may be established even if some individuals left KMD and were replaced by new members at a later date. *Riccobene*, 709 F.2d at 223. Thus, the central feature of this element is simply that each KMD member played a role in the gang that is both consistent with KMD's organizational structure and furthered the gang's activities. *Id.*

The Government presented a wealth of evidence on this point to the jury. Of particular importance, while in prison, Mr. Smith committed certain rules to writing in a "bible" that set forth the structure and bylaws of KMD. The bible recites how KMD was formed, explains how new members are initiated into the gang, gives a code of conduct, states the types of violations and punishments members would receive for breaking any "law of King Seag" (a reference to Mr. Smith), and describes the hierarchy within the gang. Testimony showed that the bible was distributed to KMD members. The Government also presented evidence that Mr. Smith held the rank of Reverend, the highest KMD rank, and that he was

the undisputed leader of KMD. The Government also presented evidence that next highest rank of "Minister" included four founding members of KMD—Robert Land, Miguel Flores, Fred Edwards, and Tony Pantelakis—as well as Collin Carter, a non-founding member of KMD. Ministers were expected to teach the bible to lower-ranking members, as well as teach them how to commit crimes in order to secure more power for KMD, fostering KMD's long-term goal of being the most powerful Salt Lake City gang and protecting its members physically and financially. Given this evidence, along with other evidence of KMD's structure outlined below, we conclude that the Government presented sufficient evidence that KMD was a continuing unit.

2.      Existence Apart From the Pattern of Racketeering Activity

The third element the Government must prove to establish that KMD was a RICO enterprise is that the gang existed as "an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583. In other words, the "enterprise" must not be just a name for the crimes KMD members committed. *See United States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir. 1996). Therefore, to satisfy this element, "it is not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity, but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses." *Riccobene*, 709 F.2d at 223–24.

The Government presented substantial evidence to the jury on this point. In 1992, when Mr. Smith was incarcerated at the Decker Lake Youth Detention Center, he formed KMD. Seeking to keep the gang organized and tight-knit, Mr. Smith modeled KMD after the Gangster Disciples, one of the largest and most powerful street gangs in the United States. Mr. Smith adopted many of the Gangster Disciples' symbols for KMD. Both, for example, use the name "Disciples"; and both use a six-pointed star, a pitchfork, and a crown to represent membership. In addition, the two founders of the Gangster Disciples were known as "King Barksdale" and "King Hoover," and, after founding KMD, Mr. Smith adopted the name "King Seagram."

There were five original members of KMD besides Mr. Smith: Mr. Land, Mr. Flores, Mr. Pantelakis, Mr. Edwards, and Jeremy Hayes. Other members were brought into the gang by a formalized process. First, a current KMD member called a "guardian angel" would vouch for and sponsor a new recruit. The guardian angel would teach the potential member about KMD and set an example of how to behave. Then, during a 67-day testing period, the recruit would be assigned a "mission" in order to prove himself. Missions were usually criminal acts of retaliation against rival gang members. Missions often included robberies, assaults, and drive-by shootings. If the potential member was either successful in his mission or silent if he was caught, he would be given a loyalty

oath and then "jumped in" (i.e., beaten by other KMD members). After the physical initiation, he would be a member of KMD—subject to Mr. Smith's final approval.

KMD held weekly meetings, even when some members were incarcerated. When Mr. Smith was not incarcerated, he personally conducted the meetings outside prison. When Mr. Smith was incarcerated, he conducted meetings inside prison and the highest-ranking non-incarcerated KMD member would conduct the meetings outside prison. KMD members were required to attend these meetings. Roll call was taken at each meeting and a member who missed a meeting was deemed to have committed a "violation." Mr. Smith decided the appropriate punishment for a violation, which would often require the member to be beaten by other KMD members. Mr. Smith also established rules for conducting the meetings, such as requiring a secretary to take notes. Mr. Smith's girlfriend, Melissa Chacon, often acted as secretary. Meetings centered on the status of KMD, concerns of KMD members in prison, financial problems of KMD members, conflicts with rival gangs, and plans to obtain money for the benefit of members and their families. Mr. Smith often issued directives at meetings.

Even during the time Mr. Smith was incarcerated, he remained the leader of KMD. While in prison, he would call Ms. Chacon regularly and give her orders such as when to call a meeting, what issues needed to be discussed, and what he

wanted members to do. Ms. Chacon would then relay these orders to other KMD members, who followed them without question.

Given this wealth of evidence, coupled with the evidence of the KMD bible, we easily conclude that there was sufficient evidence to prove that KMD had an existence as "an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583.

B.      *Pattern of Racketeering Activity*

Mr. Smith next asserts that the Government failed to present sufficient evidence that he engaged in a pattern of racketeering activity. Racketeering activity, which is frequently described as a "predicate act" or "predicate acts," consists of federal and state crimes identified in 18 U.S.C. § 1961(1). For a pattern of racketeering activity to exist, it is necessary that at least two predicate acts were committed within ten years of another. 18 U.S.C. § 1961(5). But a finding that two predicate acts were committed within this time frame—as is the case here—is not sufficient to establish a pattern of racketeering activity. Instead, the Supreme Court has held that the pattern element requires the Government to show that the predicate acts are (1) "related" and (2) that "they amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

Mr. Smith does not argue that any of the seven predicate acts found by the

jury—specifically, three acts of conspiring to commit murder, one act of conspiracy to commit arson, one act of murder, and two acts of conspiracy to commit robbery—are not predicate acts under § 1961(1). Indeed, § 1961(1) defines "racketeering activity" as "any act or threat involving murder, . . . arson, [or] robbery . . . which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1). Instead, Mr. Smith contends that there is no pattern to the acts. We disagree.

1. Relatedness

Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J.*, 492 U.S. at 240 (internal quotation omitted). Mr. Smith argues that there is insufficient evidence to find the acts related because the actors only acted out of personal reasons, not because KMD wished to retaliate against other gangs as urged by the Government. We reject Mr. Smith's argument because a jury could have concluded that at least the first five predicate acts were related insofar as they had a similar purpose. In other words, there was sufficient evidence showing that all five crimes were violent acts of retaliation committed by KMD members against rival gangs (or people believed to be members of rival gangs) for the purpose of maintaining KMD's reputation.

-15-

The first predicate act involves conspiracy to commit murder and attempted murder of a rival gang member in December 1992. On appeal, Mr. Smith contends that the shooters in this instance were retaliating for personal reasons. The Government, however, put on the following contradictory testimony: After a KMD member was assaulted by a rival gang, Mr. Smith held a meeting and told other KMD members that they needed to retaliate. Mr. Land and Mr. Flores were at the meeting. Mr. Smith gave the two men a handgun, told them he wanted the retaliation to take place at one of the rival gang's homes and drove them there, dropping them off about a block away from the target. Mr. Land and Mr. Flores walked up to the house and fired five shots inside. Flying glass hit a child and a sixteen-year-old girl was shot. Mr. Land and Mr. Flores then ran back to the car where Mr. Smith was waiting for them. This testimony constitutes sufficient evidence for a reasonable jury to find that this crime was done by KMD as an act of retaliation.

The second predicate act concerns another conspiracy to commit murder and attempted murder of rival gang members in May 1993. Here, Mr. Smith argues that the shooting was only a "spontaneous fit of temper," not an act of retaliation by KMD. Again, however, the Government submitted substantial evidence that the conduct was retaliatory in nature. The Ponchito Crip Gang ("PCG"), one of KMD's rivals, was moving into KMD territory. Mr. Smith told

KMD members that PCG could not be allowed to do so and should be driven out of the area. On May 19, 1993, a PCG member named Adan Ramirez was standing outside his home with his friend Roman Mendoza. The home was considered to be in KMD territory, but on the sidewalk in front of the home someone had written "PCG." Mr. Smith, along with other KMD members dressed in KMD's signature color of purple, walked past the house several times staring at Mr. Ramirez and Mr. Mendoza. Mr. Mendoza made an obscene hand gesture toward the KMD members, after which two KMD members ran after Mr. Ramirez and Mr. Mendoza with shotguns. The KMD members fired at the men but only struck the house. Again, a reasonable jury could conclude that this was an act of retaliation by KMD.

The next predicate act involves yet a third conspiracy to commit murder and attempted murder of a rival gang member—this time, in February 1994. Mr. Smith contends that this act was an instance of personal revenge unrelated to membership in KMD. Again, the Government offered contrary evidence. In early 1994, fifteen members of the rival Park Village Compton Crips ("PVCC") severely beat several KMD members, including Bryan Caldwell and Mr. Pantelakis. Mr. Caldwell and Mr. Pantelakis knew that if they did not retaliate, KMD and its members would lose prestige with other gangs and incarcerated KMD members would similarly lose prestige in prison. Therefore, the two men

borrowed a shotgun and planned to retaliate on February 4, 1994. Mr. Caldwell was supposed to pick up Mr. Pantelakis at his home after which the two intended to search for a PVCC member to shoot. Mr. Pantelakis, however, got tired of waiting for Mr. Caldwell and decided to take the bus. At this time, Mr. Pantelakis was under police surveillance in connection with a burglary, and a warrant for his arrest had already been issued. Police officers who had been watching Mr. Pantelakis saw him board the bus, stopped it, arrested Mr. Pantelakis, and seized a gun. Mr. Pantelakis then told the police that he was on his way to shoot someone in retaliation for a beating that had occurred the week before. While no witness testified that this predicate act took place because Mr. Pantelakis felt constrained by the KMD bible, which requires retaliation, the jury could have inferred simply from the bible's existence that any failure to retaliate for an attack on a KMD member would have damaged KMD's reputation and invited future attacks due to KMD's perceived weakness.

The fourth predicate act references a conspiracy to commit arson and attempted arson in February 1996. The Government presented the following evidence: On February 15, 1996, members of the rival Avenues gang shot KMD member Davin Trujillo. He was paralyzed by the attack. Mr. Lopez and Mr. Carter, who were with Mr. Trujillo when he was shot, identified the shooter as Adam Archuleta. At this time, Mr. Smith was in the Utah State Prison.

That night and over the next few days, Mr. Smith called Ms. Chacon from prison to discuss the shooting. These phone conversations were recorded by the Utah State Prison and submitted into evidence. In those phone calls, Mr. Smith instructed Ms. Chacon to tell Mr. Lopez, Mr. Flores, and Mr. Carter that they needed to retaliate against the Avenues. Mr. Smith said that he wanted the three KMD members and Ms. Chacon to spend the night in the same house. Ms. Chacon was to wake the KMD members at 5:30 A.M. the next day, February 16, and the three men were to break into a home belonging to Avenues members and shoot members of the rival gang at approximately 6:00 A.M. They were to use Mr. Smith's nine-millimeter handgun and Ms. Chacon's .380 Beretta, and they were to leave the guns about a block away after the shooting.

The next day, however, no retaliation took place. Mr. Smith told Ms. Chacon that if Mr. Lopez, Mr. Flores, and Mr. Carter did not retaliate, then they would be "cancelled" (i.e., kicked out of KMD). Ms. Chacon, the three men, and two members of an associate gang then met to discuss retaliation against the Avenues. They decided to firebomb a house they believed to be occupied by Mr. Archuleta. On February 18, the men filled some beer bottles with gasoline and stuck pieces of rags in them as wicks. They lit the bottles on fire and threw them into the house. The gang members, however, were mistaken about the home's occupants. The family living there had no connection to the Avenues.

Mr. Smith argues on appeal that the disconnect between the shooting he ordered and the firebombing that was committed proves a lack of relatedness. This argument, however, is without merit because—even by Mr. Smith's account—the firebombing was related to KMD's desire to retaliate against a rival gang.

The fifth predicate act references a conspiracy to murder a rival gang member and the commission of a murder in February 1996. These crimes represent KMD's continued attempt to retaliate against the Avenues. Three days after the firebombing, Mr. Smith again spoke with Mr. Lopez, Mr. Flores, and Mr. Carter while they were at Ms. Chacon's house. Angered with their actions, Mr. Smith again threatened to "cancel" those KMD members. Mr. Carter and Mr. Lopez begged for another chance. Mr. Smith outlined the same plan he had in mind originally: the three were to break into an Avenues home and shoot its occupants at 6:00 A.M. the following morning. On February 22, the three KMD members drove to the house where they believed Mr. Archuleta lived. Seeing an open window and a man sleeping on the floor a few feet beside it, Mr. Flores stuck a 12-gauge shotgun through the window and shot the man twice in the head. The man, Joey Miera, was killed by the shots. Mr. Miera, however, was neither a member of, nor associated with, the Avenues. On appeal, Mr. Smith does not argue that this murder is unrelated to any other predicate act.

Based upon this record, a reasonable jury could conclude that all five crimes were violent acts of retaliation committed by KMD members against rival gangs (or people believed to be members of rival gangs) for the purpose of maintaining KMD's reputation, which were conducted upon Mr. Smith's direct or indirect orders. Therefore, we conclude there was sufficient evidence for the jury to determine that at least these five predicate acts were related.

2. Continuity

Predicate acts must also "amount to or pose a threat of continued criminal activity" in order to establish a pattern of racketeering activity. *H.J.*, 492 U.S. at 239. "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. Proving continuity may be done in several ways; there is no bright-line rule. *Id.* Indeed, whether this requirement is met "depends on the specific facts of each case." *Id.* at 242.

We look to two especially relevant factors when performing continuity analyses. *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir. 1993). First, "we consider the duration of the related predicate acts." *Id.* Related predicate acts that span only a few weeks or months, and that do not pose a future threat of criminal conduct, do not meet this test. *H.J.*, 492 U.S. at 242. Second, we consider "the extensiveness of the RICO enterprise's scheme." *Resolution*

-21-

*Trust Corp.*, 998 F.2d at 1543. The extensiveness of the enterprise's scheme is determined by considering several sub-factors: "the number of victims, the number of the racketeering acts, the variety of racketeering acts, whether the injuries caused were distinct, the complexity and size of the scheme, and the nature or character of the enterprise or unlawful activity." *Id.* at 1543–44 (internal citations omitted).

Mr. Smith simply argues, without discussing *Resolution Trust*, that the evidence at trial did not support a finding that there was an ongoing threat of criminal activity. But this type of continuity—the "open-ended" variety—is not the only type of continuous activity recognized by both this Court and the Supreme Court. The continuity requirement may also be found when there is a closed period of related conduct; in that case, there need not be a threat of future activity. Therefore, based on an analysis of the *Resolution Trust* factors, we conclude that there was sufficient evidence for the jury to find that at least the first five predicate acts demonstrated a period of closed-ended continuity. Because we previously concluded that there was sufficient evidence for the jury to find that at least the first five predicate acts were related, the Government presented sufficient evidence for a jury to find a pattern of racketeering activity under RICO.

C.     *Nexus Between the Enterprise and the Racketeering Activity*

Next, Mr. Smith asserts that there is insufficient evidence of a nexus between KMD and the predicate acts. In a RICO prosecution, the Government must prove a relationship between the racketeering activity and the enterprise. *United States v. Killip*, 819 F.2d 1542, 1549 (10th Cir. 1987). A nexus between the racketeering activity and the enterprise is established when there is "a relation between the predicate offenses and the affairs of the enterprise." *Id.* In this case, the requisite relationship may be proved by demonstrating that KMD facilitated the commission of the predicate acts. *See id.*

Mr. Smith argues, as he also does with respect to the "relatedness" element above, that each person who committed a predicate act did so for personal reasons unrelated to his membership in KMD. As we previously explained, there was sufficient evidence for the jury to conclude that each of the first five predicate acts were acts of retaliation ordered, directly or indirectly, by Mr. Smith in his capacity as leader of KMD. That evidence, therefore, is also sufficient to establish a nexus between the predicate acts and KMD.

D.     *Conspiracy to Violate RICO*

Section 1962(d) prohibits a person from conspiring to violate § 1962(c). The conspiracy element of § 1962(d) requires the Government to demonstrate only that the defendant knew about and agreed to facilitate the commission of—rather than personally committed or agreed to commit—at least two of the

-23-

predicate acts constituting a pattern of racketeering activity that were proven at trial. *See Salinas*, 522 U.S. at 66. In this case, the jury found seven predicate acts, each of which was committed by a member of KMD other than Mr. Smith, and we concluded that at least the first five constituted a pattern of racketeering activity: two shootings at the homes of rival gang members, the attempted shooting of a rival gang member by Mr. Pantelakis, the firebombing, and the murder of Mr. Miera. Therefore, to decide whether there was sufficient evidence to convict Mr. Smith of conspiring to violate § 1962(c), we must first determine whether there was sufficient evidence for a jury to find that Mr. Smith knew about and agreed to facilitate the commission of at least two of those five predicate acts.

There is no question that Mr. Smith ordered the murder of Mr. Miera, as he admits to it. Mr. Smith argues, however, that the most the Government proved at trial was that he knew about the remaining predicate acts, as opposed to proving that he agreed to facilitate their commission. We disagree.

There was sufficient evidence that Mr. Smith agreed to facilitate the commission of all five predicate acts. With respect to the first predicate act, the walk-up shooting, testimony at trial established that Mr. Smith ordered the shooting, chose the target of the shooting, supplied the gun, and drove the shooters to the location of the target. As to the second predicate act, there was

evidence that Mr. Smith indicated at a KMD meeting that the rival gang needed to be driven from KMD's neighborhood. The retaliation in the fourth predicate, like the murder of Mr. Miera, was expressly ordered by Mr. Smith. While he had wanted a shooting, rather than a firebombing, to be the type of retaliation, there is no question that he had ordered some type of violent retaliation. The fact that the event that ultimately took place—throwing gasoline-filled beer bottles and lit rags into a house—was somewhat different than what he had originally ordered, entering the house and shooting its occupants, does not undermine the jury's conclusion that he agreed that a retaliatory act should occur.

Finally, with respect to the third predicate act, the attempted shooting of a rival PVCC member by Mr. Pantelakis, the Government did not offer direct evidence of an express agreement by Mr. Smith. A conspiratorial agreement, however, "need not be express so long as its existence can plausibly be inferred from the defendant['s] words and actions and the interdependence of activities and persons involved." *United States v. Cianci*, 378 F.3d 71, 90 (1st Cir. 2004) (internal quotations omitted). Here, the Government established that KMD routinely retaliated against rival gang members for acts of violence committed against its own members, that Mr. Smith often expressly ordered acts of retaliation, and that the purpose of retaliating was to maintain the reputation of KMD which in turn protected individual members. Although Mr. Smith was

incarcerated when Mr. Pantelakis was arrested with the shotgun, there was sufficient evidence for the jury to find that Mr. Smith had a tacit agreement between himself and members of KMD that they would retaliate in response to attacks on KMD members. Therefore, we conclude that the Government presented sufficient evidence that Mr. Smith agreed to facilitate the first five predicate acts.

### III. JURY INSTRUCTIONS

Besides arguing that the evidence at trial was insufficient to support his conviction under 18 U.S.C. § 1962(d), Mr. Smith also contends that the District Court improperly instructed the jury. Jury instructions are reviewed "to determine whether, as a whole, the instructions correctly state the governing law and provide the jury with an ample understanding of the issues and applicable standards." *United States v. Fredette*, 315 F.3d 1235, 1240 (10th Cir. 2003) (internal quotation marks omitted).

*A. Effect on Interstate Commerce*

The District Court instructed the jury that "the government must prove beyond a reasonable doubt . . . that the enterprise was engaged in, or its activities had an effect upon, interstate commerce." Another instruction stated that the purchase and sale of controlled substances produced or cultivated outside of Utah or the use of firearms or ammunition manufactured outside of Utah may be

sufficient to prove the interstate commerce element of § 1962(c).  Mr. Smith

maintains that the District Court erred by not instructing the jury that it must find

the activities of KMD *substantially* affected interstate commerce under *United*

*States v. Lopez*, 514 U.S. 549 (1995) and *United States v. Morrison*, 529 U.S.

598 (2000).

Mr. Smith, however, did not make this objection at trial.  We therefore

review the District Court's use of the instruction for plain error.  *United States v.*

*Lott*, 310 F.3d 1231, 1241 (10th Cir. 2002).  Thus, Mr. Smith must demonstrate

that the jury instruction (1) is erroneous; (2) is plainly so; and (3) that the error

affects substantial rights; if he satisfies these criteria, we may exercise discretion

to correct the error only if it "seriously affects the fairness, integrity, or public

reputation of judicial proceedings."  *Id.* (alterations omitted).

Under plain-error review, an error is "plain" if it is "obvious or clear, i.e.,

if it is contrary to well-settled law."  *United States v. Edgar*, 348 F.3d 867, 871

(10th Cir. 2003).  Whether § 1962(c) should be interpreted to require a

substantial effect on interstate commerce is an open question in this circuit.  We

note, however, that neither the Supreme Court nor any courts of appeals have

held that the effect must be substantial, and a number of our sister circuits have

held that a de minimis effect on interstate commerce is sufficient to satisfy this

statutory requirement.  *See United States v. Shyrock*, 342 F.3d 948, 984 (9th Cir.

2003) (holding that the district court properly instructed the jury that § 1962(c)'s jurisdictional element was satisfied if the jury found "a de minimis affect [sic] on interstate commerce"); *United States v. Marino*, 277 F.3d 11, 35 (1st Cir. 2002) (holding that "the government does not need to show that the RICO enterprise's effect on interstate commerce is substantial"); *United States v. Riddle*, 249 F.3d 529, 537 (6th Cir. 2001) (holding that a "RICO enterprise's necessary relationship to interstate commerce" is "de minimis"); *United States v. Miller*, 116 F.3d 641, 674 (2d Cir. 1997) (holding that "the government need only prove that the individual subject transaction has a de minimis effect on interstate commerce" in order to satisfy § 1962(c)). As these decisions make clear, the District Court's instruction was not contrary to well-settled law, and therefore even if the District Court erred, the error is not plain. As such, Mr. Smith's argument does not satisfy plain-error review.

We also find no merit in Mr. Smith's argument that the evidence was insufficient to establish the requisite effect on interstate commerce. To begin, this argument is also subject to plain-error review because Mr. Smith did not raise this issue in his motion for judgment of acquittal. *See United States v. Kimler*, 335 F.3d 1132, 1141 (10th Cir. 2003) (applying plain-error review because "[when] a Rule 29 motion [for a judgment of acquittal] has been made on specific grounds, 'all grounds not specified in the motion are waived'")

-28-

(quoting *United States v. Chance*, 306 F.3d 356, 369 (6th Cir. 2002)). Mr. Smith's sufficiency of the evidence argument is predicated on the view that the jury needed to find a substantial effect on interstate commerce. Because we reject this argument, and because the jury made findings sufficient to support a de minimis impact on interstate commerce, the District Court did not plainly err in affirming a jury verdict that was based, in part, on this instruction.

B.     *Whether Interstate Commerce Must Have Been Contemplated by the RICO Conspiracy*

Mr. Smith further argues that the jury should have been instructed that "the Government must prove that the defendant's agreement contemplated or that the defendant had a reasonable basis to foresee that the affairs of the enterprise would affect interstate commerce."

The District Court's refusal to issue a particular jury instruction is reviewed for an abuse of discretion. *United States v. Edwards*, 69 F.3d 419, 433 (10th Cir. 1995). The District Court did not abuse its discretion here. The phrase "engaged in, or the activities of which affect, interstate or foreign commerce" is a jurisdictional, rather than substantive, element of 18 U.S.C. § 1962(c). We have held that "knowledge of such jurisdictional facts is not generally an element of the required intent under federal statutes." *United States v. Speir*, 564 F.2d 934, 938 (10th Cir. 1977) (citing *United States v. Feola*, 420 U.S. 671, 684–85 (1975)); *see also United States v. Gumbs*, 283 F.3d 128, 136

-29-

(3d Cir. 2002); *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994). We hold, then, that the Government was not required to prove Mr. Smith knew or should have known that KMD was engaged in, or its activities affected, interstate commerce. The District Court, therefore, did not abuse its discretion in refusing to instruct the jury on this point.

## C.    *Variance*

Mr. Smith next contends that his conviction was obtained on the theory that all members of KMD were members of a single conspiracy even though the proof at trial disclosed only multiple conspiracies, and that the rule of variance prohibits this practice under *United States v. Johanson*, 56 F.3d 347, 350 (2d Cir. 1995). A "simple variance" occurs when the charging terms in the jury instructions reflect the charges in the indictment, but the evidence at trial proves materially different facts from those alleged in the indictment. *Hunter v. New Mexico*, 916 F.2d 595, 598 (10th Cir. 1990); *see also Edwards*, 69 F.3d at 432 (holding that when "a single conspiracy is charged in the indictment, and the government proves only multiple conspiracies, a defendant who suffers substantial prejudice must have his conviction reversed"). Mr. Smith, however, did not raise this issue in his motion for acquittal notwithstanding the verdict. As such, we review it only for plain error, see *Kimler*, 335 F.3d at 1141, and hold that there was no variance.

-30-

To begin, Mr. Smith's reliance on *Johanson* is misplaced. In that case, Mr. Johanson was indicted for, and convicted of, conspiring to commit credit card fraud with four other men—Mr. Louros, Mr. Ferrante, Mr. Barwick, and Mr. Degel. *Johanson*, 56 F.3d at 350. Mr. Barwick pleaded guilty, but the remaining defendants were tried together. *Id.* The evidence at trial established that "several credit card fraud conspiracies existed—one between Barwick, Ferrante, and Degel; one between Barwick and Johanson; and a third between Johanson and Barwick." *Id.* at 351. There was no evidence, however, that linked all four defendants to a single, overarching conspiracy. *Id.* Indeed, the Government failed to put on any evidence that Mr. Johanson even knew Mr. Ferrante or Mr. Degel, or that they shared a common goal. *Id.* Therefore, the Second Circuit held that "[b]ecause the indictment charges a single conspiracy to commit credit card fraud, but the evidence shows multiple conspiracies to commit credit card fraud, there is a variance between the allegation in the indictment and the proof at trial." *Id.*

In this case, however, there is no question that Mr. Smith personally knew and worked in conjunction with the other members of KMD named as RICO coconspirators in order to further the reputation and power of KMD through criminal conduct. Indeed, this type of relationship, which we have characterized as "interdependence," is the key issue in determining whether a single conspiracy

exists. *See Edwards*, 69 F.3d at 432 ("Interdependence exists where each coconspirators' activities constituted essential and integral steps toward the realization of a common, illicit goal.") (internal quotations omitted).

We therefore disagree with Mr. Smith's contention that because the participants in the predicate acts varied from act to act, as did their motivation and the methods of the acts' commission, there could not have been any interdependence among the coconspirators and therefore no single, overarching conspiracy. First, we have already held that there was sufficient evidence for a jury to conclude that the purpose underlying at least five predicate acts was the same—to retaliate violently against rival gang members in order to maintain the power and prestige of KMD. Second, we agree with the First Circuit that:

> The government need not show that each conspirator knew of or had contact with all other members. Nor need it show that the conspirators knew all of the details of the conspiracy or participated in every act in furtherance of the conspiracy. Changes in the cast of characters do not preclude a finding of a single overarching conspiracy.

*United States v. Soto-Beniquez*, 356 F.3d 1, 19 (1st Cir. 2004) (internal citations omitted). In this case, then, we hold that there was no variance between the single conspiracy alleged in the indictment and the Government's evidence at trial.

D.    *Nexus Between KMD and the Racketeering Activity*

Mr. Smith argues that the jury was prevented from acquitting him because

-32-

the District Court refused to instruct the jury that the enterprise was conducted through the pattern of racketeering activity and to define the term "through." The District Court's refusal to issue a particular jury instruction is reviewed for an abuse of discretion. *Edwards*, 69 F.3d at 433. Moreover, if "the charge as a whole adequately states the law, the refusal to give a particular instruction is not an abuse of discretion." *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473 (10th Cir. 1990).

Here, the jury charges, taken in their entirety, adequately reflect the law. The District Court first instructed the jury that Mr. Smith was charged with conspiring to violate § 1962(c), which makes it a crime to "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." The District Court went on to charge the jury that "[t]he first element that the government must prove beyond a reasonable doubt is that KMD was an 'enterprise' engaged in a pattern of racketeering activity." These two instructions sufficiently related to the jury that they must find a nexus—that is, "a relation"—between the racketeering activity and the affairs of the enterprise. *Killip*, 819 F.2d at 1549. The District Court, therefore, did not abuse its discretion in refusing to issue Mr. Smith's proposed instruction.

E.    *Special Verdict Form*

For a RICO conviction to stand, the jury must have found unanimously that the defendant committed or agreed to commit at least two predicate acts. *See* 18 U.S.C. § 1961(5). In Mr. Smith's trial, the District Court issued a special verdict form that stated, "Write the numbers of the racketeering acts that you have unanimously found that Mr. Smith agreed would be committed." On the blank line following the instruction, the jury wrote "1, 2, 3, 4, 5, 14, 8." These numbers correspond to the walk-up shooting, the shooting at the home of rival gang members, Mr. Pantelakis' arrest with a shotgun on his way to retaliate against PVCC members, the firebombing, the murder of Mr. Miera, and the two home invasion robberies.

Mr. Smith argues that the District Court erred in using that form instead of his proposed form. His proposed form named each predicate act along with a specific "yes" or "no" question as to whether he had committed or agreed to commit the act. Mr. Smith contends that the District Court's failure to use his form led to juror confusion and the possibility that the jury did not make a unanimous decision as to each predicate act.

We review a special verdict form for abuse of discretion. *Webb v. ABF Freight Sys., Inc.*, 155 F.3d 1230, 1249 (10th Cir. 1998). The District Court did not abuse its discretion here. The verdict form stated explicitly that the jury must be unanimous in its findings. Moreover, the jury instructions also clearly stated

that the jurors "must all agree unanimously on at least two of the same racketeering acts" in order to convict Mr. Smith. Hence, Mr. Smith's contention is without merit.

## IV. SUFFICIENCY OF THE EVIDENCE CHALLENGE TO THE MURDER IN AID OF RACKETEERING CONVICTION

Mr. Smith was also convicted under 18 U.S.C. § 1959(a), which prohibits a person from, among other things, committing murder "for the purpose of gaining entrance to or maintaining or increasing [his] position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). As such, the Government must prove beyond a reasonable doubt that (1) KMD was an enterprise within the meaning of RICO; (2) that KMD was engaged in racketeering activity; (3) that Mr. Smith had a position in KMD; (4) that Mr. Smith conspired to murder Mr. Miera; and (5) that his general purpose in doing so was to maintain or increase his position in KMD. *See United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992). Mr. Smith argues that the Government did not present sufficient evidence that he conspired to murder Mr. Miera to maintain or enhance his leadership position in KMD, contending that he murdered Mr. Miera only to avenge the attack on Mr. Trujillo. We disagree.

In evaluating the sufficiency of the evidence, we review the record de novo. *Nelson*, 383 F.3d at 1229. There is sufficient evidence to uphold a conviction if a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.* In

-35-

making this determination, we review the direct and circumstantial evidence, along with all reasonable inferences therefrom, in the light most favorable to the Government. *Id.*

The Government need not establish that Mr. Smith's sole or principal motive for conspiring to murder Mr. Miera was to maintain or increase his position in KMD in order for it to convict Mr. Smith under § 1959(a). *See United States v. Pimentel*, 346 F.3d 285, 295 (2d Cir. 2003). Instead, proof that the crime was "committed as an integral aspect of membership in [KMD]" is sufficient to establish this element of a § 1959(a) offense. *United States v. Thai*, 29 F.3d 785, 817 (2d Cir. 1994) (internal quotations omitted). Therefore, we agree with the Second Circuit that "the motive requirement is satisfied if 'the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.'" *United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001).

In this case, there was extensive testimony at trial that acts of violence were a common part of KMD's culture and that members were expected to retaliate against acts of violence committed on fellow members. In addition, there was testimony that members of KMD felt pressure to live up to their KMD nicknames—and it is undisputed that Mr. Smith was the "King" of KMD. Mr.

Smith, however, argues that because he was already the leader of KMD, he could not have ordered the murder to increase his position in the gang. We disagree. A conviction under § 1959(a) will stand even when the underlying crime was sanctioned by a high-ranking leader of the RICO enterprise, if the high-ranking leader was expected to act and any failure to do so would have undermined his position in the enterprise. *See Dhinsa*, 243 F.3d at 671–72. We find this to be the case here. A reasonable jury, therefore, could have concluded that Mr. Smith ordered the murder of Mr. Miera to maintain or increase his position in KMD.

## V. PRO SE SUPPLEMENTAL BRIEF

We allowed Mr. Smith to file a pro se supplemental brief raising additional issues on appeal. In that brief, Mr. Smith raises four arguments, which we address below.

*A.*     *Recorded Phone Conversations Between Mr. Smith and Ms. Chacon as Inadmissible Fruit of an Unlawful Arrest*

Mr. Smith was arrested in 1993 in conjunction with a drive-by shooting. He was convicted and sentenced to the Utah State Prison, where he remained until his parole in October 1995. That December, however, the Utah Board of Pardons and Parole ("the board") determined that he violated the conditions of his parole and issued a warrant for his arrest, known as a "retaking warrant." He was detained by Utah police officers and returned to the Utah State Prison, where he

-37-

later implicated himself in Mr. Miera's murder in his telephone conversations with Ms. Chacon. Mr. Smith argues that the board acted unlawfully in issuing a retaking warrant, and that his phone conversations were therefore "fruit of the poisonous tree" and should not have been admitted at trial. The District Court rejected this argument. Reviewing de novo, *United States v. Parker*, 362 F.3d 1279, 1281 (10th Cir. 2004), we affirm.

Mr. Smith's argument fails for two reasons. First, the "fruit of the poison tree" doctrine excludes evidence obtained in reliance upon an illegal search. *See Nardone v. United States*, 308 U.S. 338, 341 (1939) (establishing the doctrine). This Fourth Amendment doctrine does not provide absolute immunity from prosecution for crimes committed by a wrongfully incarcerated defendant, which appears to be Mr. Smith's argument.

Moreover, Mr. Smith's argument that he was wrongfully incarcerated also fails. He first argues that it is unconstitutional under the Utah Constitution for the board, rather than a judge, to issue retaking warrants. This contention was squarely rejected by the Utah Supreme Court in *Jones v. Utah Board of Pardons and Parole*, 94 P.3d 283 (Utah 2004). Mr. Smith next argues that the board breached an implied contract contained in his parole agreement when it, rather than a judge, determined he had violated the terms of his parole. Regardless of how Mr. Smith construes the language in his parole agreement, Utah law

authorizes the board to decide if the conditions of parole have been violated. *See* Utah Code Ann. § 77-27-11.

*B.    Denial of Right to Self-Representation*

Mr. Smith next asserts that he was improperly denied the right to represent himself. When a motion to proceed pro se is made, we review de novo whether a constitutional violation occurred and for clear error the factual findings underlying the district court's decision to deny the motion. *United States v. Mackovich*, 209 F.3d 1227, 1236 (10th Cir. 2000). The constitutional right to represent oneself in a criminal trial is conditioned upon a knowing, voluntary, and intelligent waiver of the right to be represented by counsel. *Faretta v. California*, 422 U.S. 806, 835 (1975). Determining whether the defendant has competently waived his right to counsel, then, should be based on "a thorough and comprehensive formal inquiry . . . on the record to demonstrate that the defendant is aware of the nature of the charges, the range of allowable punishments and possible defenses, and is fully informed of the risks of proceeding pro se." *United States v. Willie*, 941 F.2d 1384, 1388 (10th Cir. 1991). The competence of a defendant's waiver of the right to counsel depends only on his competence in waiving that right, however, not on whether he is competent to represent himself at trial. *Godinez v. Moran*, 509 U.S. 389, 399 (1993). Indeed, the Supreme Court has explained that a defendant's technical legal knowledge is not relevant to

-39-

whether he is competent to waive the right to counsel; therefore, a criminal defendant's ability to defend himself is inconsequential to whether he is competent to make that choice for himself. *Id.* at 400.

Whether a defendant knowingly, intelligently, and voluntarily relinquished his right to counsel, however, is only one factor in determining whether the district court unconstitutionally denied him his right to self-representation rather. We have also held that, in order to invoke the right to self-representation, a defendant must do so unequivocally and in a timely fashion. *Mackovich*, 209 F.3d at 1236. In addition, the Supreme Court has noted that the defendant must be "able and willing to abide by rules of procedure and courtroom protocol." *McKaskle v. Wiggins*, 465 U.S. 168, 173 (1984). With this in mind, we turn to the circumstances of Mr. Smith's two requests to proceed pro se.

On May 1, 2003, six days before trial was scheduled to begin, Mr. Smith told the District Court that he was not getting along with his appointed attorneys. The District Court asked Mr. Smith if he was asking to represent himself. Mr. Smith stated that he did not have the education to represent himself and simply wanted new counsel because he did not agree with their legal and trial strategy. The District Court refused this request, explaining to Mr. Smith that his attorneys had decades' worth of experience trying federal criminal cases, that the District Court had made the unusual decision to appoint him two attorneys (rather than

-40-

only one) due to the complexity of the charges against him, and that the District Court had—for the first time in any case before it—given his counsel the assistance of a paralegal to help them prepare for trial. The last two decisions, the District Court pointed out to Mr. Smith, were made because his attorneys had requested them and, being effective advocates, had convinced the court that they were necessary. The District Court told Mr. Smith that his attorneys had worked almost exclusively on his case for nearly a year, and that it would take a new attorney months to catch up.

Mr. Smith was not satisfied with the District Court's explanation, however, and told the court that he would not communicate further with his lawyers—not even to inform them who to contact in order to get street clothes to wear at trial. The District Court told Mr. Smith that it was not in his best interest to appear in his prison jumpsuit in front of the jury, but he still refused to speak to his attorneys, stating that "I don't have any attorneys." He also indicated that he might have to be disruptive in trial in order to properly defend himself. The District Court construed this last statement as a request to represent himself and began eliciting information from Mr. Smith. Through that colloquy, the court learned that Mr. Smith is a high school graduate with no college education; he has had no formal legal study; he has never represented himself previously; he has never represented anyone else; he has little knowledge of the Federal Rules of

Evidence and is unfamiliar with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); and he has had no formal study of the rules of criminal procedure.  The District Court also noted that a RICO prosecution is complicated and that fifty-two witnesses were going to be called to testify in his prosecution.  Finally, the District Court found that Mr. Smith's decision to proceed pro se was "dictated by emotion."  The District Court then refused to allow Mr. Smith to represent himself, stating "I find that you cannot represent yourself, that you are not capable of representing yourself because of your inability to handle these kinds of complex issues."

While we agree with Mr. Smith that his knowledge of the law and his ability to represent himself have no bearing on his choice to proceed pro se, see *Faretta*, 422 U.S. at 834, several other reasons support the District Court's decision.  First, "[t]his court 'will indulge in every reasonable presumption against waiver.'"  *United States v. Taylor*, 113 F.3d 1136, 1140 (10th Cir. 1997).  This requirement not only "protect[s] against an inadvertent waiver of the right to counsel by a defendant's occasional musings on the benefits of self-representation . . . . [but] also prevents a defendant from taking advantage of and manipulating the mutual exclusivity of the rights to counsel and self-representation."  *Mackovich*, 209 F.3d at 1236 (internal quotations and citations omitted).  Hence, "we . . . ascribe a 'constitutional primacy' to the right to counsel because this

right serves both the individual and collective good, as opposed to only the individual interests served by protecting the right of self-representation." *Id*. at 1237.

Second, "[w]e have repeatedly shown concern with the use of the right to waive counsel as a 'cat and mouse' game with the courts." *United States v. Reddeck*, 22 F.3d 1504, 1510 (10th Cir. 1994). The record shows that in asking the District Court to represent himself, Mr. Smith refused to speak to his attorneys altogether—even in front of the presiding judge and even to the extent it meant he would have to wear his prison clothing to his own trial to his own detriment. Mr. Smith also threatened to disobey the court's instructions not to speak during trial, after which the District Court intimated that Mr. Smith was intending only to continue the case and delay the prosecution. Mr. Smith's request, therefore, falls into this "cat and mouse" game category. Indeed, the record illustrates that Mr. Smith was not "able and willing to abide by rules of procedure and courtroom protocol." *McKaskle*, 465 U.S. at 173.

Third, the District Court also noted that Mr. Smith's "very late request" was untimely. *See Mackovich*, 209 F.3d at 1236. While we have never determined precisely when a request to proceed pro se becomes untimely, we have found waiver when a defendant failed to assert the right clearly until six days before trial—which is the exact circumstance we face here. *United States v.*

*Bennett*, 539 F.2d 45, 51 (10th Cir. 1976). We conclude, then, that in this case Mr. Smith's request to represent himself was untimely. Although the jury had not yet been impaneled, Mr. Smith asserted his right to self-representation six days before trial in a case that had been going on for nearly a year, that had already been continued, and that involved complex issues that would mandate another lengthy continuance to allow Mr. Smith to prepare for his own defense.

Based on our review of Mr. Smith's behavior and statements during his request to proceed pro se, we conclude that the District Court did not err when it found that Mr. Smith did not intend to abide by courtroom decorum and that his request was not timely made. For similar reasons we find Mr. Smith's subsequent request to represent himself made on May 5, 2003 untimely as well. Therefore, Mr. Smith was not unconstitutionally denied his right to self-representation.

C.    *Denial of Evidentiary Hearing*

Mr. Smith next asserts he was improperly denied an evidentiary hearing. During a pretrial hearing, Mr. Smith's attorneys argued that FBI Special Agent Juan Becerra had entered Mr. Smith's cell at the Utah State Prison when he was not in it and removed and photocopied several documents, including allegedly privileged documents relating to defense strategy and discussions between Mr. Smith and his counsel. They contended that this conduct violated Mr. Smith's Sixth Amendment right to the effective assistance of counsel and to a fair trial.

-44-

Mr. Becerra happened to be in the courtroom during this pretrial hearing, so the District Court held an impromptu evidentiary hearing on the matter. Mr. Becerra testified that he had removed documents from Mr. Smith's cell but that he was only trying to find a sample of his handwriting identifying him as "King Seagram." He testified further that he did not see or remove any legal documents, and he did not turn any such documents over to the prosecutors. A prosecutor then proffered that the Government had not received any documents of that type. Nonetheless, the District Court ordered Mr. Becerra to turn over all documents taken from Mr. Smith's cell to defense counsel.

The District Court came back to this issue several months later and made specific rulings on the matter. First, the court ruled that the Government could not use any of the documents. *See Weatherford v. Bursey*, 429 U.S. 545, 554 (1977) (holding that no Sixth Amendment violation occurred when privileged communications were not revealed to the prosecution and not introduced at trial to the detriment of the defendant). Then the court found that Mr. Becerra was a credible witness, that the purpose of the search was not to interfere with the defense, and that everything taken from Mr. Smith's cell had been, or would be, turned over to him. The District Court then denied defense counsels' request for an additional evidentiary hearing in order to establish Mr. Becerra's real motive and whether sanctions should be imposed for possible Sixth Amendment

violations.

In his pro se supplemental brief, Mr. Smith similarly argues that he was denied an evidentiary hearing to establish that he was prejudiced by Mr. Becerra's actions. We review the denial of an evidentiary hearing for an abuse of discretion. *United States v. Gines*, 964 F.2d 972, 977 (10th Cir. 1992). Mr. Smith, however, does not indicate how he suffered prejudice or how he could have established that prejudice during a second evidentiary hearing. Beyond his own allegation, nothing in the record suggests that documents taken from his cell were privileged or work product, were given to the Government, or were used in trial. To the contrary, the District Court found that Mr. Becerra was a credible witness who neither took nor distributed to others legal documents belonging to Mr. Smith; it also ruled that nothing seized from his cell could be used at trial. Based on our review of the record, the District Court did not abuse its discretion in denying a further evidentiary hearing.

D. *Other Arguments Concerning the Admissibility of Recorded Phone Conversations Between Mr. Smith and Ms. Chacon*

Mr. Smith's last contention is that the telephone calls to Ms. Chacon from the Utah State Prison that implicated him in the murder of Mr. Miera were inadmissible. Although his attorneys stipulated to their admission, Mr. Smith now challenges their admissibility for two reasons. First, he argues that federal agents obtained the recordings from state officers without a warrant. Second, he

argues that the phone calls were the property of the phone company, rather than the Utah State Prison, and therefore the prison did not have authority to release the recordings to federal agents. Because these arguments were not made to the District Court, however, we review the District Court's decision to admit the recordings for plain error. "To constitute plain error, the district court's mistake must have been both obvious and substantial. The substantiality requirement of the plain error rule embodies a requirement that the defendant prove prejudice attributable to the error." *United States v. Dean*, 76 F.3d 329, 333 (10th Cir. 1996) (internal quotations and citations omitted).

Here, even if we assume that admitting the calls into evidence constitutes error that is plain, Mr. Smith fails to show how such an error affects his substantial rights. Meeting this standard "usually means that the error affected the outcome of the district court proceedings." *United States v. Cotton*, 535 U.S. 625, 632 (2002) (internal quotations omitted). In this case, multiple witnesses implicated Mr. Smith with the murder of Mr. Miera. One of those witnesses was Ms. Chacon, the person to whom he spoke in the recorded telephone calls. Moreover, Ms. Chacon testified as to the content of the conversations, and her testimony was uncontroverted. Given that evidence, we conclude that Mr. Smith fails to demonstrate that had the phone calls not been admitted the jury would have returned a different verdict. We therefore decline to correct any alleged

error.

## VI. CONCLUSION

The Government presented sufficient evidence on every element of the RICO conspiracy charge for a reasonable jury to find him guilty beyond a reasonable doubt. We conclude that the District Court did not abuse its discretion in instructing the jury on the RICO conspiracy charge. We also conclude that the Government presented sufficient evidence on the 18 U.S.C. § 1959(a) count. Finally, we hold that Mr. Smith's pro se arguments are without merit. For the foregoing reasons, we AFFIRM.