FILED
United States Court of Appeals
Tenth Circuit

June 18, 2010

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

v.

ROBERT GUYTON COOK,

       Defendant - Appellant.

No. 09-2152
(D.C. No. 07-CR-00766)
(D. N.M.)

ORDER AND JUDGMENT[*]

Before **KELLY**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge and
**LUCERO**, Circuit Judge.


     In October 2008, a jury convicted Defendant-Appellant Robert Guyton

Cook of conspiracy to murder in aid of racketeering and conspiracy to distribute

methamphetamine. The court sentenced Mr. Cook to 180 months' imprisonment

and four years' supervised release. On appeal, he challenges the sufficiency of

the evidence on both counts and argues that the district court erred when it

required him to wear shackles during his trial. Aplt. Br. at 14-16. We have

_____

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

jurisdiction under 28 U.S.C. § 1291 and affirm.

We view the evidence in the light most favorable to the government.
United States v. Taylor, 592 F.3d 1104, 1108 (10th Cir. 2010).

**A.    The Plan to Kill Deputy Anders.**

In December, 2004, Otero County Deputy Sheriff Billy Anders shot and
killed Earl Flippen minutes after Mr. Flippen murdered Deputy Anders's partner.
4 R. at 799-801, 804-06, 810-11.  For this crime, Deputy Anders pled guilty to
voluntary manslaughter and served one year in state prison.  Id. at 811.

Mr. Flippen was the New Mexico leader of the Aryan Brotherhood.  Id. at
841, 914.  In early 2005, the Aryan Brotherhood's generals ordered its members
to kill Deputy Anders.  4 R. at 838-40, 871-74, 1440; Gov. Exs. 4, 5.

In May of 2006, Owen Puckett, a major who replaced Mr. Flippen as New
Mexico's leader, told D.W. that he wanted to plan avenging Mr. Flippen's death.
4 R. at 914, 931-32.  D.W., a senior captain in the New Mexico Aryan
Brotherhood, was a federal informant.  Id. at 910-12.  He introduced an
undercover FBI agent, "Pete," as a prospective member who would carry out the
murder.  Id. at 932-33.

At a meeting on May 13, 2006, Mr. Puckett, Pete, and D.W. agreed to kill
Deputy Anders once he left prison.  Id. at 933, 943, 1368-69.  They settled on a

method for the murder and planned a getaway car and weapons. Id. at 943, 1369. Mr. Puckett then wrote to Aryan Brotherhood generals for approval. Id. at 945-46.

## B.     Arranging and Planning the Murder.

About a week later, Robert Cook, a Texas Aryan Brotherhood major, contacted Mr. Puckett about the plan. Id. at 195, 229-30. Mr. Puckett and D.W. then scheduled a meeting to plan the murder with Mr. Cook. Id. at 232-33, 236, 259-60, 1448-49; Gov. Ex. 26. Before the meeting, Mr. Cook offered his home as a "safe house" for the murderer. 4 R. at 1459-60. Mr. Cook also let Samuel Arrington, a captain in the Aryan Brotherhood, know about the meeting. Id. at 1334, 1459. D.W. and Mr. Cook together finalized the location, travel, and attendees. Id. at 1024, 1468-69; Gov. Ex. 39.

Meanwhile, Mr. Puckett was arrested for violating his parole. 4 R. at 1471. He nevertheless remained in charge of New Mexico Aryan Brotherhood from jail and helped with the plan. 4 R. at 1221, 1471-73. For example, he told D.W. to promote Pete to a higher rank after the murder. Id. at 1472.

On August 26, 2006, Mr. Cook and Mr. Arrington met with D.W. and Pete. Id. at 1050, 1055; Gov. Ex. 41. Mr. Cook told Pete how to stalk and kill Deputy Anders. Gov. Ex. 41. He also said, "If you need to I'll come in from out of state and do it." Id. Mr. Cook again offered Pete a safe house. 4 R. at 1069. At one point, D.W. said that "a threat to one is a threat to all," and Mr. Arrington nodded

in agreement.  Id. at 1066; Gov. Ex. 41.

Mr. Cook later reported the plan to a general, saying, "everything out there was a go."  4 R. at 1139, 1147-48.  By this time, the group was just waiting for April 2007, when Deputy Anders would leave prison.  Id. at 1093, 1148.

**C.      Brokering a Methamphetamine Sale to Finance the Murder.**

About a month after the meeting, D.W. asked Mr. Arrington to get Pete some methamphetamine he could sell while on the run.  Id. at 1090-91, 1338.  Mr. Arrington agreed and negotiated for methamphetamine on their behalf.  Id. at 1227-31.  Mr. Arrington also said that Pete could stay with him after the murder. Id. at 1335.  Soon after, Mr. Cook chastised D.W. and Mr. Arrington for talking about the murder instead of concealing the plan.  Id. at 1091-92.

A few days after that, on October 4, 2006, D.W. told Mr. Cook that he needed a pound of methamphetamine to sell and "turn at a profit," to finance the killing of Deputy Anders.  Gov. Ex. 45.  Mr. Cook said, "I can get it for you. That ain't a problem."  Gov. Ex. 45.  He stated that his captain, Weyman Mathews, had a methamphetamine connection.  4 R. at 1101; Gov. Ex. 45.

On October 9, 2006, Mr. Cook told D.W. that the price would be between $8,000 and $10,000 a pound, and that he and Mr. Mathews were ready when D.W. had the money.  4 R. at 276, 278-79; Gov. Ex. 46.  D.W. told Mr. Cook that he needed the final price.  Gov. Ex. 46.

After Mr. Cook phoned Mr. Mathews, he told D.W. that the price would be

$7500 to $8000.  4 R. at 279-80; Gov. Ex. 47.  Mr. Cook repeated that he was getting the drugs through Mr. Mathews, who required payment up front.  4 R. at 280-81; Gov. Ex. 47.  Mr. Cook also said that they would need three or four days' notice.  4 R. at 280; Gov. Ex. 47.  Mr. Cook agreed to deliver the drugs personally for an extra $1000.  Gov. Ex. 47.

On October 25, 2006, D.W. called Mr. Cook to see whether they "were on." 4 R. at 282; Gov. Ex. 51.  Mr. Cook said that they were, and he detailed when and where D.W. would meet Mr. Mathews.  Gov. Ex. 51.  D.W. again asked not to pay up front, saying that he would "turn" the methamphetamine quickly.  Id.  Mr. Cook replied that payment was up to Mr. Mathews.  Id.  D.W. then complained that it was "an awful large amount" of cash for "a first time meet."  4 R. at 284-85; Gov. Ex. 51.  Mr. Cook replied, "That's where you just gotta trust [Mr. Mathews]."  Gov. Ex. 51.  D.W. never consummated the deal.  4 R. at 285-86.

## D.    The Trial and Verdict.

In March 2008, Mr. Cook was charged with conspiring to murder in aid of racketeering, under 18 U.S.C. § 1959(a)(5), and with conspiracy to distribute fifty grams or more of methamphetamine, under 21 U.S.C. §§ 841(a)(1), (b)(1)(B) & 846.  1 R. at 37-41, 47-48.  Before trial, Mr. Cook objected to wearing restraints before the jury.  1 Supp. R. at 2-3.  The court said,

> I'm going to leave that up to the marshals.  They run — they handle
> security.  I'm not a security expert.  They are. . . . . as far as whether
> shackles need to be on after jury selection or not, again, that'll be up to

[two deputies], who are the marshals in charge of this proceeding.  So that's how I intend to handle it.  Also, I'll delegate to the marshals about how they want [seating to take place].

Id. at 9-10.  Mr. Cook wore shackles during trial.  4 R. at 864-65.  But, to conceal the shackles, the court ordered long cloth skirts to surround the counsel tables. Id., 1 Supp. R. at 2-3, 9.

The jury found Mr. Cook guilty of both conspiracies.  1 R. at 435-36.  The court denied Mr. Cook's motions for acquittal and sentenced him to 180 months' imprisonment and four years' supervised release.  Id. at 366-71, 425, 427-28.

## Discussion

This court reviews sufficiency of the evidence claims de novo, examining all evidence and drawing all reasonable inferences in the light most favorable to the government, to determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt.  United States v. Oldbear, 568 F.3d 814, 822-23 (10th Cir. 2009).  We do not evaluate witness credibility or weigh conflicting evidence.  United States v. Parker, 553 F.3d 1309, 1316 (10th Cir. 2009).  "We also do not review the evidence in 'bits and pieces,' but we evaluate the sufficiency of the evidence by 'consider[ing] the collective inferences to be drawn from the evidence as a whole.'"  Id. (citation omitted).

**A.  Conspiracy to Murder Deputy Anders.**

To prove Mr. Cook guilty of conspiracy to murder in aid of racketeering, the government had to prove that (1) the Aryan Brotherhood was an "enterprise" under 18 U.S.C. § 1959(b)(2); (2) that Mr. Cook was a member of the Aryan Brotherhood; (3) that the Aryan Brotherhood engaged in "racketeering activity" under 18 U.S.C. § 1961(1); (4) that Mr. Cook conspired to murder Deputy Anders, and (5) that his general purpose in doing so was to maintain or increase his position in the Aryan Brotherhood. 18 U.S.C. § 1959(a); see United States v. Smith, 413 F.3d 1253, 1277 (10th Cir. 2005).

Mr. Cook challenges the government's evidence on the fourth element, that he conspired to murder Deputy Anders. Aplt. Br. at 24-31. Mr. Cook argues that he did not conspire with anyone other than a government agent, and that the government failed to prove interdependence among the coconspirators. Id. A conspiracy does not exist when a defendant colludes only with government agents or informers. United States v. Hardwell, 80 F.3d 1471, 1482 (10th Cir. 1996). Mr. Cook claims that he could not have conspired with Mr. Arrington because Mr. Arrington was merely present at a meeting where the murder was discussed. Aplt. Br. at 26, 30-31. He also asserts that he could not have conspired with Mr. Puckett because their phone calls reflected no agreement and because Mr. Puckett withdrew from the conspiracy when he was arrested. Aplt. Br. at 25-26, 30-31.

A jury nevertheless could reasonably conclude that Mr. Cook conspired with Mr. Arrington and Mr. Puckett, neither of whom were government agents.

Mr. Puckett initiated the plan before his arrest and continued facilitating it from jail. The jury could conclude that Mr. Puckett never withdrew from the conspiracy. To withdraw from a conspiracy, a conspirator must make an affirmative act disavowing or defeating the purpose of the conspiracy. United States v. Gonzalez, 596 F.3d 1228, 1234 (10th Cir. 2010). As well, Mr. Arrington joined the conspiracy while Mr. Cook was a member. Mr. Arrington nodded his approval of the plan at the August meeting. He later offered to provide a safe house and to get methamphetamine to finance the murder.

Mr. Cook participated in the conspiracy while Mr. Puckett and Mr. Arrington were fellow conspirators. Mr. Cook coordinated communications, planned meetings, took direction from generals, prescribed the method of the murder, offered to commit the murder, and advised the others how to avoid being caught. He offered to provide a safe house for the murderer and brokered a drug deal to finance the murder. In short, ample evidence showed that Mr. Cook conspired with Mr. Puckett and Mr. Arrington to murder Deputy Anders.

**B. Conspiracy to Distribute Methamphetamine.**

To prove Mr. Cook guilty of conspiring to distribute methamphetamine, the government had to prove that (1) Mr. Cook and at least one other person agreed to distribute methamphetamine; (2) that Mr. Cook knew the essential objective of the conspiracy; (3) that Mr. Cook knowingly and voluntarily involved himself in the conspiracy; (4) there was interdependence among the members of the

conspiracy, and (5) the overall scope of the conspiracy involved 50 grams or more of methamphetamine. 21 U.S.C. §§ 841, 846; United States v. Caldwell, 589 F.3d 1323, 1329 (10th Cir. 2009).

Mr. Cook challenges the sufficiency of the evidence on the first and fourth elements, arguing that the government failed to prove agreement or interdependence between himself and a non-governmental actor. Aplt. Br. at 31-40. Mr. Cook argues that he and Mr. Mathews only had a buyer-seller relationship. Aplt. Br. at 36-40.

Yet a rational jury could conclude the opposite. Mr. Cook agreed to be the middle man in a five-figure methamphetamine transaction between D.W. and Mr. Mathews. Mr. Cook said that he was getting the drugs from Mr. Mathews. He checked with Mr. Mathews about all the details of the deal — the price, the timing, and whether D.W. would have to pay cash up front. The jury could infer from this that Mr. Cook secured Mr. Mathews's agreement to sell the drugs to D.W. for distribution.

The jury also could find that these drugs were for distribution. D.W. told Mr. Cook that he would resell the drugs. The large amount of methamphetamine at stake would have alerted Mr. Mathews that D.W. would distribute it. Mr. Cook's involvement with Mr. Mathews thus went far beyond being an independent, one-time buyer of an individual portion of drugs. Cf. United States v. McIntyre, 836 F.2d 467, 471-72 (10th Cir. 1987).

Mr. Cook and Mr. Mathews were also interdependent. If Mr. Cook had not arranged the deal, Mr. Mathews could not have sold these drugs to D.W.. And if Mr. Mathews did not provide the drugs, Mr. Cook would not be able to finance his murder conspiracy by helping D.W. distribute this methamphetamine.

Contrary to Mr. Cook's arguments, the fact that D.W. could have obtained methamphetamine elsewhere does not negate the interdependence of Mr. Cook and Mr. Mathews. Aplt. Br. at 34. "What is needed is proof that [Mr. Cook and Mr. Mathews] intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged." United States v. Evans, 970 F.2d 663, 671 (10th Cir. 1992). A jury could reasonably find that sufficient cooperation existed between Mr. Cook and Mr. Mathews.

## C. Restraining Mr. Cook at Trial.

As part of the presumption of innocence, a defendant has a qualified right not to appear before a jury in shackles. United States v. Wardell, 591 F.3d 1279, 1293 (10th Cir. 2009). "'A district court, however, retains the discretion to take measures to maintain order and security within its courtroom.'" Id. In any given case, a district court must weigh these competing concerns and make a decision on the record. Id. at 1294. It may not delegate its decision to the United States marshals, although it may rely heavily on their advice. United States v. Apodaca, 843 F.2d 421, 431 (10th Cir. 1988).

We accordingly review a district court's physical restraint of the defendant

for an abuse of discretion.  <u>Id.</u>  But, keeping in mind due process, we also give restraints "'close judicial scrutiny.'"  <u>Wardell</u>, 591 F.3d at 1293 (citing <u>Estelle v. Williams</u>, 425 U.S. 501, 504 (1976)).  Here, it is a close case whether or not the district court impermissibly delegated its discretion to the marshals.  We, however, need not decide this issue.  Even assuming that the court erred when it shackled Mr. Cook, the record does not show that the jury saw the shackles and was thereby prejudiced against him.  Table skirts covered all restraints.  And although Mr. Cook's counsel expressed concern that jurors may have read a newspaper article mentioning the shackles, the record does not show that any jurors had read the article in violation of the court's instruction not to do so.  4 R. at 864-65; 5 R. at 203.  Accordingly, Mr. Cook cannot show prejudice and any presumption of prejudice that applies when a jury saw or knew of the shackles does not apply.  <u>Wardell</u>, 591 F.3d at 1294.

AFFIRMED.  We GRANT Mr. Cook's motion to supplement the record.

ENTERED FOR THE COURT
PER CURIAM