**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 15, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

SAMUEL ZACHARY ARRINGTON,

Defendant-Appellant.

No. 09-2151
(D.C. No. 2:07-CR-00766-WJ-6)
(D.N.M.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **BALDOCK**, and **HOLMES**, Circuit Judges.
———————————————————

Samuel Zachary Arrington appeals from the district court's denial of his

motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29.

Mr. Arrington contends that the government presented insufficient evidence to

support the jury's conclusion that he was guilty of (1) conspiracy to commit

murder in aid of racketeering, in violation of the Violent Crimes in Aid of

Racketeering Act ("VICAR"), 18 U.S.C. § 1959(a), and (2) conspiracy to

distribute fifty grams or more of methamphetamine, in violation of the Controlled

---

[*]      This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited,
however, for its persuasive value consistent with Federal Rule of Appellate
Procedure 32.1 and Tenth Circuit Rule 32.1.

Substances Act, 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm the district court's denial of the motion and resulting judgment.

## BACKGROUND[1]

On December 18, 2004, Otero County Deputy Sheriffs Billy Anders and Robert Hedman responded to a report of domestic violence and gunfire at a rural cabin between Mayhill and Cloudcroft, New Mexico. Earl Flippen lived in the cabin, along with his girlfriend and a three-year-old girl. As the deputies approached the cabin, they noticed blood on the front porch. The deputies knocked on the front door. Mr. Flippen and the young girl answered. Mr. Flippen was agitated and nervous, refused to leave the cabin to speak with the deputies, and abruptly slammed and locked the door.

Deputy Anders returned to his vehicle to call for backup. While Deputy Anders spoke to the dispatcher, he heard a gunshot from the vicinity of the cabin. He unsuccessfully attempted to locate Deputy Hedman by calling out for him. Deputy Anders noticed the young girl standing outside of the cabin. As Deputy Anders approached the young girl to inquire into the whereabouts of her father, Mr. Flippen ambushed him from behind a parked car. During the ensuing gun

---

[1]     When reviewing the denial of a motion for a judgment of acquittal, we consider the evidence in the light most favorable to the government. *United States v. Vigil*, 523 F.3d 1258, 1262 (10th Cir. 2008).

battle, Deputy Anders shot and wounded Mr. Flippen. Deputy Anders radioed again for backup, handcuffed Mr. Flippen, and removed Mr. Flippen's firearm from the immediate area. When Deputy Anders continued his investigation, he found Deputy Hedman shot dead on the back porch. Deputy Anders returned to the front of the cabin, instructed the young girl to go inside, and shot and killed Mr. Flippen. For this transgression, Deputy Anders was convicted of voluntary manslaughter and incarcerated for one year.

This tragic sequence of events implicated a white-supremacist organization known as the Aryan Brotherhood. Mr. Flippen had been the leader of the New Mexico subchapter of the Aryan Brotherhood of Texas. Aryan Brotherhood members were outraged at what they perceived to be the murder of the defenseless Mr. Flippen and wanted to exact their revenge on Mr. Anders.[2]

In early 2005, the Aryan Brotherhood started to mobilize their membership. On April 17, 2005, an Aryan Brotherhood leader ordered the murder of Mr. Anders. In mid-2005, the leader of the New Mexico subchapter attempted to implement the order, but was arrested when he hired an undercover law

---

[2] Under the Aryan Brotherhood constitution, members must retaliate in kind for any attack against another member. *See* R., Vol. III at 1070 ("If a bro gets killed, whoever committed the murder . . . should be hit, should be taken out . . . [should be] [k]illed."); *id.* at 782 ("[A]n attack on one is an attack on all."); *id.* at 582 (quoting the Aryan Brotherhood constitution as providing that "a threat/attack . . . against a made or prospective member will be considered a threat to, or attack on, the family as a whole. Without exception, all members of the family are required to come together and counter any such threat/attack.").

enforcement agent as the "hit man." In May 2006, Owen Puckett, the new leader of the New Mexico subchapter, hatched a new plan to murder Mr. Anders. He solicited the assistance of D.W., a high-ranking member of the New Mexico subchapter, who also happened to be a federal informant. D.W. introduced "Pete," an undercover agent with the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), as a candidate to carry out the murder of Mr. Anders.

On May 13, 2006, Mr. Puckett, D.W., and Pete held a "church meeting"[3] to plan the murder. In a wide-ranging conversation, they discussed the plan for murdering Mr. Anders, along with one of his family members, after Mr. Anders was released from prison. They also discussed weapons, a getaway car, and a safe house for Pete. Mr. Puckett subsequently sought concurrence for the murder plan from the Aryan Brotherhood leadership.

On August 26, 2006, the Aryan Brotherhood held a church meeting in Las Cruces, New Mexico, to refine the plan for murdering Mr. Anders. Robert Cook and Mr. Arrington, high-ranking members of the Aryan Brotherhood of Texas, attended the church meeting. Also in attendance were D.W., Pete, and several undercover ATF agents posing as prospective members of the Aryan Brotherhood. At the outset of the church meeting, D.W. mentioned the Flippen incident and

---

[3] "Church meeting is what the Aryan Brotherhood calls their meetings to . . . discuss criminal activities and their plans to further the Aryan Brotherhood." R., Vol. III at 867.

ominously noted that it soon would bring a lot of heat on the Aryan Brotherhood. After addressing some general housekeeping matters, D.W. dismissed the prospective Aryan Brotherhood members, except for Pete, to enable the ranking members to discuss sensitive material. Mr. Arrington remained in the room for this sensitive discussion.

Once the prospective members had left the room, D.W. began speaking in general terms about the existence of a direct order. He also noted that Pete soon would complete a "blood tie," Gov't Ex. 41 at 26:16–26:33, which means "killing somebody or hurting them very badly." R., Vol. III at 753. Throughout the meeting, Mr. Arrington leafed through informational materials regarding Mr. Anders's killing of Mr. Flippen. When D.W. repeated the Aryan Brotherhood's constitutional tenet that "a threat to one is a threat to all," Mr. Arrington emphatically nodded his head in agreement. Gov't Ex. 41 at 30:03–30:26.

A little more than a month after the Las Cruces church meeting, on September 29, 2006, D.W. called Mr. Arrington on the telephone. Although Mr. Arrington was too busy to talk at the time, he returned the telephone call soon thereafter. During this telephone conversation, Mr. Arrington expressly agreed with the decision to kill Mr. Anders. Mr. Arrington stated that Mr. Anders deserved to be killed for meddling with the Aryan Brotherhood, even though he noted that the proposed time and place of the murder were "a hard one to fall on." Gov't Ex. 43A2 at 3:52–4:01. When D.W. stated that the murder would draw

unwelcome attention to the Aryan Brotherhood, Mr. Arrington reiterated his agreement with the decision. Mr. Arrington also readily agreed that Pete could stay with him after the murder, renewing this offer on two other occasions during the telephone conversation. Finally, Mr. Arrington agreed to "look into" procuring some methamphetamine to help finance the murder of Mr. Anders. Gov't Ex. 43A2 at 9:34–9:55.

On October 1, 2006, Mr. Arrington contacted D.W. and told him that he could obtain three pounds of methamphetamine at a price of $15,000 per pound. When D.W. expressed surprise at this price, Mr. Arrington offered to negotiate it down to $8,000 or $10,000 per pound. Mr. Arrington also stated that his drug supplier wanted to sell one pound at a time. D.W. suggested that he would not pay more than $10,000 per pound. Mr. Arrington promised to try to reduce the price and stated that he would call D.W. again.

On October 1 and 2, 2006, D.W. and Mr. Arrington had several more telephone conversations regarding the proposed drug transaction. Within an hour after the initial conversation, Mr. Arrington called D.W. and told him that he had negotiated the price down to $12,500 per pound. Mr. Arrington also reiterated that his drug supplier would deliver the methamphetamine in one-pound increments over a three-month period. When D.W. stated that he would think about it, Mr. Arrington offered to try to lower the price further. A few minutes later, Mr. Arrington called to announce that he had negotiated the price down to

$10,000 per pound.  Mr. Arrington also offered to have the drug supplier "squat on," or reserve, the drugs for D.W.  Apparently explaining why the drug supplier would be willing to make such an accommodation, Mr. Arrington noted that the supplier was "a brother."  Gov't Ex. 44A3 at 00:08–00:11.  In a final telephone conversation, D.W. asked Mr. Arrington for a few days to acquire the money to purchase the methamphetamine.  Mr. Arrington replied that the drugs would be available whenever he was ready to purchase them.  D.W. never consummated the drug transaction.

On March 18, 2008, Mr. Arrington and eleven codefendants were indicted in a nine-count second superseding indictment in the U.S. District Court for the District of New Mexico.  Count 1 of the indictment charged Mr. Arrington with conspiring to commit a violent crime in aid of racketeering—*viz.*, conspiring to murder former Otero County Deputy Sheriff Billy Anders, in violation of 18 U.S.C. § 1959(a)(5).  Count 8 of the indictment charged Mr. Arrington with conspiring to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846.  Mr. Arrington and two codefendants were tried before a jury.  On October 7, 2008, the jury found Mr. Arrington guilty on both counts.[4]

---

[4]       The jury found one of Mr. Arrington's codefendants, Robert Cook, guilty of the charges that were lodged against him in the Second Superseding Indictment.  We previously affirmed the district court's judgment sustaining that

(continued...)

The district court denied Mr. Arrington's written motion for judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29(a), on both counts in a memorandum opinion and order dated February 11, 2009. On June 5, 2009, the district court entered a judgment sentencing Mr. Arrington to concurrent terms of (1) 120 months of imprisonment and three years of supervised release on the murder-conspiracy count; and (2) 132 months of imprisonment and four years of supervised release on the drug-conspiracy count. Mr. Arrington timely appeals.

**DISCUSSION**

On appeal, Mr. Arrington challenges the sufficiency of the evidence underlying his convictions. He argues that the evidence adduced at trial was insufficient to sustain the jury's verdict on the (1) conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5); and (2) conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846.

"We review the sufficiency of the evidence to support a jury's verdict and the denial of [a] motion for judgment of acquittal de novo." *Vigil*, 523 F.3d at 1262. In conducting this review, "[w]e ask whether a reasonable jury could

---

[4](...continued)
verdict in a separate order and judgment. *See United States v. Cook*, No. 09-2152, 2010 WL 2473859, at * 1 (10th Cir. June 18, 2010). The jury could not reach a verdict concerning the other codefendant.

find a defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government and drawing reasonable inferences therefrom." *Id.*; *accord United States v. Hamilton*, 413 F.3d 1138, 1143 (10th Cir. 2005). We neither "weigh conflicting evidence nor consider the credibility of witnesses." *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004). We "simply determine whether [the] evidence, if believed, would establish each element of the crime." *United States v. Vallo*, 238 F.3d 1242, 1248 (10th Cir. 2001) (quoting *United States v. Evans*, 42 F.3d 586, 589 (10th Cir. 1994)) (internal quotation marks omitted). "[R]eversal is only appropriate if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Burkley*, 513 F.3d 1183, 1190 (10th Cir.) (quoting *United States v. Austin*, 231 F.3d 1278, 1283 (10th Cir. 2000)) (internal quotation marks omitted), *cert. denied*, 128 S. Ct. 2979 (2008).

## I.     Conspiracy to Commit Murder in Aid of Racketeering

Mr. Arrington contends that the district court erred in denying his motion for judgment of acquittal on the murder-conspiracy count. In particular, Mr. Arrington claims that the evidence was insufficient to prove beyond a reasonable doubt that he agreed to join the conspiracy to murder Mr. Anders.

"VICAR was enacted by Congress in 1984 as a violent crime corollary to the RICO statute." *United States v. Jones*, 566 F.3d 353, 361 (3d Cir.), *cert. denied*, 130 S. Ct. 528 (2009). "Congress enacted VICAR to complement

RICO" and intended for VICAR "to be liberally construed to effectuate its remedial purposes." *United States v. Banks*, 514 F.3d 959, 967 (9th Cir. 2008) (quoting *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992)) (internal quotation marks omitted); *accord United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001). In pertinent part, VICAR provides as follows:

> (a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—
>
> > (5) for attempting or conspiring to commit murder . . ., by imprisonment for not more than ten years or a fine under this title, or both . . . .

18 U.S.C. § 1959(a)(5).

To prove a conspiracy to murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(5), the government had to establish beyond a reasonable doubt that (1) the Aryan Brotherhood was an "enterprise" under 18 U.S.C. § 1959(b)(2); (2) the Aryan Brotherhood was engaged in "racketeering activity" under 18 U.S.C. § 1961(1); (3) Mr. Arrington was a member of the Aryan Brotherhood; (4) Mr. Arrington conspired to murder Mr. Anders; and (5) Mr. Arrington's general purpose in doing so was "as consideration for the receipt of,

-10-

or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing [his] position in an enterprise engaged in racketeering activity." *Id.*; *see United States v. Smith*, 413 F.3d 1253, 1277 (10th Cir. 2005), *abrogated on other grounds by United States v. Hutchinson*, 573 F.3d 1011 (10th Cir. 2009).

Mr. Arrington challenges only the fourth element—*viz.*, whether he was a member of the conspiracy to murder Mr. Anders. Under 18 U.S.C. § 1959(a), the government must satisfy each element of the predicate offense under state or federal law. *See* 18 U.S.C. § 1959(a) (prohibiting certain acts as well as the "attempt[] or conspir[acy]" to commit acts that are "*in violation of the laws* of any State or the United States" (emphasis added)); *United States v. Marino*, 277 F.3d 11, 30 (1st Cir. 2002) ("[F]or a crime to be chargeable under state law, it must at least exist under state law."); *see also United States v. Pimental*, 346 F.3d 285, 302 (2d Cir. 2003) ("[VICAR] and RICO seem to require of a predicate act based on state law that the act include the essential elements of the state crime." (quoting *United States v. Carillo*, 229 F.3d 177, 186 (2d Cir. 2000)) (internal quotation marks omitted)). Although we have not previously addressed the need to establish the elements of the predicate offense under VICAR, we have indicated that "'predicate acts[]' must be violations of certain statutes," such as a state statute, under the analogous RICO statute. *Hall v. Witteman*, 584

-11-

F.3d 859, 867 (10th Cir. 2009); *see* 18 U.S.C. § 1961(1) (defining prohibited

racketeering activity only as those acts prohibited by enumerated federal statutes

or "any act or threat involving murder . . . *which is chargeable under State law*"

(emphasis added)).

As the predicate offense for this particular prosecution, the government

claims that Mr. Arrington conspired to murder Mr. Anders in violation of New

Mexico Statutes Annotated §§ 30-2-1 (conspiracy) and 30-28-2 (willful and

deliberate murder).[5]  To prove that Mr. Arrington conspired to kill Mr. Anders

under New Mexico law, the government must establish beyond a reasonable

doubt that (1) Mr. Arrington and another person by words or acts agreed together

to commit the willful and deliberate murder of Mr. Anders; (2) Mr. Arrington

and the other person intended to commit the willful and deliberate murder of Mr.

Anders; and (3) this happened in New Mexico and elsewhere beginning on or

about April 17, 2005, and continued through March 18, 2008.  *See* N.M. Stat.

Ann. §§ 30-2-1(A)(1), 30-28-2(A); *State v. Apodaca*, 887 P.2d 756, 763 (N.M.

1994); N.M. Unif. Jury Instruction Criminal 14-2810.  The elements of willful

---

[5]     Courts have not definitively determined whether state or federal law applies to "conspiracies" under 18 U.S.C. § 1959(a).  *Compare, e.g.*, *United States v. Desena*, 287 F.3d 170, 177 n.1 (2d Cir. 2002) (noting that it "is unclear whether § 1959 imports state law of *attempt and conspiracy* or whether federal law governs"), *with Carrillo*, 229 F.3d at 186 (noting that the "attempt[] or conspiracy" must be "in violation of state or federal law").  We need not address this issue, however, because neither party objected to the application of New Mexico law before the district court or on appeal.

and deliberate murder are (1) the defendant killed the victim; (2) the killing was with the deliberate intention to take away the life of the victim; and (3) the killing happened in New Mexico or elsewhere on or about the alleged dates. *See* § 30-2-1(A)(1); *Apodaca*, 887 P.2d at 761; N.M. Unif. Jury Instruction Criminal 14-201.

In this appeal, the district court did not err in denying the motion because the government proffered substantial evidence at trial from which a jury could find beyond a reasonable doubt that Mr. Arrington had agreed to conspire with other members of the Aryan Brotherhood, including Cook, to murder Mr. Anders. On August 26, 2006, Mr. Arrington attended the Las Cruces church meeting at which the Aryan Brotherhood discussed the planned murder. At the outset of the church meeting, D.W. mentioned the Flippen incident and ominously noted that it soon would bring a lot of heat on the Aryan Brotherhood. Mr. Arrington also received and perused informational materials regarding Mr. Anders's killing of Mr. Flippen. With this knowledge, Mr. Arrington emphatically nodded his head in agreement when D.W. repeated the Aryan Brotherhood's constitutional tenet that "a threat to one is a threat to all," which means that a member must retaliate in kind for any attack on another member.

On September 29, 2006, Mr. Arrington confirmed his agreement with the murder conspiracy discussed at the church meeting during a telephone conversation with D.W. Mr. Arrington repeatedly asserted that Mr. Anders

deserved to be killed, even though the murder would draw unwelcome attention to the Aryan Brotherhood and he was uncertain about the logistics of the operation. Mr. Arrington also readily agreed to harbor the purported hit man after the murder. Finally, Mr. Arrington agreed to procure methamphetamine to help finance the murder of Mr. Anders.

Although Mr. Arrington concedes the existence of a conspiracy to murder Mr. Anders, he claims that he never actually agreed to join the conspiracy. Mr. Arrington asserts that he was merely present at a meeting where the government informant, the undercover agent, and Mr. Cook discussed the planned murder. He also claims that he never made any statement during the meeting in support of the conspiracy and never engaged in any conduct to further the conspiracy, noting that his sympathy for or approval of the conspiracy was not enough to constitute an agreement. Although Mr. Arrington never spoke at the meeting, the record demonstrates that he nodded his head in agreement when D.W. stated that "a threat to one is a threat to all." This non-verbal assent followed his receipt of information describing Mr. Anders's killing of Mr. Flippen—*viz.*, after he obtained information concerning Mr. Anders's fatal attack on a fellow member of the Aryan Brotherhood. Furthermore, during a series of telephone conversations, Mr. Arrington also made express oral statements in which he agreed with the conspiracy; agreed to take the facilitative action of harboring Pete after the murder; and agreed to procure methamphetamine to help finance the murder

conspiracy. Mr. Arrington subsequently engaged in conduct in furtherance of the conspiracy when he negotiated the purchase and delivery of the methamphetamine.

Thus, based on this evidence, a jury reasonably could find Mr. Arrington guilty beyond a reasonable doubt of conspiring to murder Mr. Anders.

## II.    Conspiracy to Distribute Methamphetamine

Mr. Arrington also contends that the district court erred in denying his motion for judgment of acquittal on the drug-conspiracy count. In particular, Mr. Arrington claims that the evidence was insufficient to prove beyond a reasonable doubt that he agreed to join the conspiracy to distribute methamphetamine.

To prove a conspiracy in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846, the government must establish beyond a reasonable doubt that (1) Mr. Arrington agreed with one or more persons to distribute fifty grams or more of methamphetamine; (2) Mr. Arrington knew at least the essential objectives of the conspiracy; (3) Mr. Arrington knowingly and voluntarily took part in the conspiracy; and (4) the conspirators were interdependent. *See United States v. Hernandez*, 509 F.3d 1290, 1295 (10th Cir. 2007).

Mr. Arrington challenges only the first element—*viz.*, whether he agreed with one or more persons to distribute fifty grams or more of methamphetamine. "[A] jury can infer an agreement constituting a conspiracy from the acts of the

parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose." *United States v. Scull*, 321 F.3d 1270, 1282 (10th Cir. 2003) (quoting *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997)) (internal quotation marks omitted). "[A] defendant need not have knowledge of all the details or all the members of the conspiracy . . . ." *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005) (quoting *United States v. Mendoza-Salgado*, 964 F.2d 993, 1005 (10th Cir. 1992)) (internal quotation marks omitted).

"[T]he connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt." *United States v. Hamilton*, 587 F.3d 1199, 1207 (10th Cir. 2009) (quoting *United States v. Tranakos*, 911 F.2d 1422, 1430 (10th Cir. 1990)) (internal quotation marks omitted) ("Even a single overt act by the defendant can be sufficient to connect him to the conspiracy if that act leads to a reasonable inference of intent to participate in an unlawful agreement or criminal enterprise." (quoting *United States v. Pack*, 773 F.2d 261, 266 (10th Cir. 1985)) (internal quotation marks omitted)), *cert. denied*, 130 S. Ct. 3443 (2010). However, a court "cannot sustain a conspiracy conviction if the evidence does no more than create a suspicion of guilt or amounts to a conviction resulting from piling inference on top of inference." *Hernandez*, 509 F.3d at 1295 (quoting *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991)) (internal quotation

marks omitted). "[T]he inference of an agreement must be more than mere speculation or conjecture." *Delgado-Uribe*, 363 F.3d at 1083. "A defendant's activities are interdependent if they facilitated the endeavors of other alleged conspirators or facilitated the venture as a whole." *United States v. Ivy*, 83 F.3d 1266, 1286 (10th Cir. 1996) (quoting *Horn*, 946 F.2d at 740–41) (internal quotation marks omitted).

In this appeal, the government offered substantial evidence at trial from which a jury could find beyond a reasonable doubt that Mr. Arrington conspired *with his supplier* to distribute more than fifty grams of methamphetamine. On September 29, 2006, D.W. asked for Mr. Arrington's assistance in obtaining methamphetamine. Mr. Arrington subsequently called D.W. and told him that he could procure three pounds of methamphetamine (i.e., approximately 1360 grams) at $15,000 per pound. Mr. Arrington continued to negotiate with his supplier, frequently calling D.W. to update him on changes to the price and the terms of delivery. After much wrangling, Mr. Arrington negotiated a price of $10,000 per pound to be delivered one pound at a time in three monthly installments. When D.W. asked for a few days to gather the funds necessary for the transaction, Mr. Arrington replied that the drugs would be available whenever he was ready to purchase them.

Mr. Arrington makes several unavailing arguments in an attempt to claim that he never agreed to join the drug conspiracy. First, Mr. Arrington argues that

he was merely present during the telephone conversation with D.W. "[T]he fact of defendant's presence at the crime scene is material and probative, but mere presence is not sufficient in and of itself." *Id.* at 1285 (quoting *United States v. Nicholson*, 983 F.2d 983, 989 (10th Cir. 1993)) (internal quotation marks omitted). Although D.W. appears to have initiated the discussion about the proposed drug transaction in a telephone conversation, the record reveals that Mr. Arrington called D.W. on several occasions to update him on the status of the negotiations with his drug supplier.

Second, Mr. Arrington claims that during the telephone conversation he never made any statement or engaged in any conduct to further the drug conspiracy. As discussed *supra*, after the initial telephone conversation, Mr. Arrington contacted his drug supplier, haggled over the price and other details of the transaction, and frequently updated D.W. on the status of the transaction. Through his own extensive contributions, Mr. Arrington brought the drug transaction to the brink of consummation; the supplier had the drugs and was ready to sell them.

Third, Mr. Arrington argues that any telephonic statements to D.W. in furtherance of the proposed drug deal were insufficient to join the conspiracy because D.W. was a governmental agent. Although "there can be no indictable conspiracy involving only the defendant and government agents or informers," *United States v. Barboa*, 777 F.2d 1420, 1422 (10th Cir. 1985); *accord United*

-18-

*States v. Reyes*, 979 F.2d 1406, 1408 n.4 (10th Cir. 1992), the indictment charged Mr. Arrington with conspiring "with other persons whose names are known and unknown to the grand jury" rather than with D.W.  R., Vol. I at 46.  "[A] conspiracy conviction will stand if there is sufficient evidence from which the jury could have concluded that an unknown or unnamed coconspirator existed and that defendant and the unknown or unnamed coconspirator agreed to violate the drug laws."  *United States v. Howard*, 966 F.2d 1362, 1364 (10th Cir. 1992); *accord United States v. Nichols*, 374 F.3d 959, 969 (10th Cir. 2004).

In this case, the record indicates that Mr. Arrington engaged in multiple conversations with an unnamed drug supplier.  These conversations covered the price, quantity, and delivery of methamphetamine for distribution.  Nothing in the record indicates that Mr. Arrington's drug supplier was a governmental agent.  Indeed, there is significant record evidence that affirmatively speaks to the contrary.  In apparently offering an explanation for why his supplier would be willing to "squat" on the drugs for D.W., Mr. Arrington described him as "a brother."  A reasonable jury could infer that Mr. Arrington intended for this description to convey to D.W. that his supplier was a member of the Aryan Brotherhood.  Notably, Mr. Arrington does not even suggest here, much less argue, that his supplier was a governmental agent.  Accordingly, the evidence was sufficient for a jury to determine, beyond a reasonable doubt, that an unknown, non-governmental coconspirator existed and that this conspirator and

-19-

Mr. Arrington agreed to violate the law by distributing methamphetamine to D.W.

Finally, Mr. Arrington argues that the evidence against him is too ambiguous to constitute an agreement because he never directly answered D.W.'s requests for drugs. As stated *supra*, however, the record contains ample, unambiguous evidence that Mr. Arrington agreed to procure methamphetamine for distribution and took several actions to further that goal.

Thus, based on this evidence, a jury reasonably could find Mr. Arrington guilty beyond a reasonable doubt of conspiring to distribute fifty grams or more of methamphetamine.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order denying Mr. Arrington's motion for acquittal and its resulting judgment.


ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge